DICKHUT, Respondent, v. NORTON, Appellant.

*No. 21. Argued December 1, 1969.—Decided January 9, 1970.*
(Also reported in 173 N. W. 2d 297.)

390

For the appellant there was a brief by *Louis J. Mestre,* attorney, and *James A. Walrath* of counsel, both of Milwaukee, and oral argument by *Mr. Mestre.*

For the respondent there was a brief by *Rud W. Talsky,* attorney, and *George L. Horaitis* of counsel, both of Milwaukee, and oral argument by *Mr. Horaitis.*

BEILFUSS, J. The issue is whether a tenant, in an unlawful detainer action, can assert as a valid defense an allegation that the landlord's attempt to terminate the tenancy and evict the tenant was motivated as retaliation for the tenant's complaint to the health authorities of a housing code sanitary violation.

The defendant contends that he has a federally guaranteed constitutional right to make such complaints and that for a state to permit such retaliation violates or abridges his constitutional rights. He further contends that public policy of this state as expressed or derived from housing laws, health laws, and local ordinances would be frustrated if he is not permitted to assert this defense.

Pertinent statutory provisions as to terminating tenancies and eviction proceedings are as follows:

"234.03 **Tenancies, how terminated.** Whenever there is a tenancy at will or by sufferance, created in any manner, the same may be terminated by giving at least 30 days' notice in writing to the tenant requiring him to remove from the demised premises, or by the tenant's giving at least 30 days' notice in writing that he shall remove from said premises, and by surrendering to the landlord the possession thereof within the time limited in such notice; . . ."

"291.01 **Proceedings to remove tenant, etc., holding over.** In the following cases any tenant or lessee at will, or by sufferance, or for any part of a year, or for one or more years of any real property, including a specific or undivided portion of a house or other dwelling, and the assigns, undertenants or legal representatives of such tenant or lessee may be removed therefrom in the manner prescribed in this chapter, except that nothing herein contained shall affect the provisions of section 234.19:

" (1) When such person holds possession after the expiration of the term by lapse of time or after such tenancy at will or sufferance has been terminated by either party

in the manner provided in sections 234.03 and 234.04, and without the permission of the landlord."

"291.05 **Action, how commenced.** The plaintiff shall file with the county court or with a municipal justice of the city, town or village where the premises are located, a complaint signed by him, his agent or attorney, giving therein a description of the premises of which possession is claimed, stating the facts which authorize the removal of the defendant, naming him, and praying for his removal. If the complaint is filed in the county court the provisions of ch. 299 with respect to pleading and practice shall apply. . . ."

"291.07 **Proceedings and pleadings.** After the return of the summons served as above provided, and at the time and place named therein, if the defendant appear he may answer the complaint; and all matters in excuse, justification or avoidance of the allegations of the complaint must be answered specifically; and thereupon the justice shall proceed to hear and determine the action unless he shall adjourn the trial as provided in s. 291.08; but either party may demand a trial by jury. The proceedings in such action shall be the same as in other civil actions in a municipal court except as in this chapter otherwise specially provided."

The argument of the defendant upon constitutional grounds is that the first amendment of the United States Constitution guarantees to him the right to petition his government for redress of grievances as well as what he labels the inherent right to report violations of the law (housing code violations) to appropriate authorities.

The first amendment provides, in part: "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." And the fourteenth amendment provides, in part: ". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The right protected by the first and fourteenth amendments is that the government shall not make laws to

abridge these rights. Here, it is the action of one private party as against another that is complained of. Neither the legislature by statute, nor the city council by ordinance, have in any way prohibited the defendant from complaining of housing code violations. The argument, supported to some extent by the cases cited by the defendant, is that the state, by legislatively and judicially affording a means to the plaintiff to evict him because of the exercise of his first amendment rights, is acting in violation of the federal constitution.

While we express our reservations as to whether the facts and factors of this action bring it within the concept proposed by the defendant, we find it unnecessary to reach the constitutional question because of our opinion that the legislative public policy of this state permits the defense to be raised.

There can be no doubt that the legislature and the common council of the city of Milwaukee have both recognized that blighted, substandard and insanitary housing conditions do exist and that they are detrimental to the public interest.

Sec. 66.435, Stats., known as the Urban Renewal Act, provides:

"(2) FINDINGS. It is hereby found and declared that there exists in municipalities of the state slum, blighted and deteriorated areas which constitute a serious and growing menace injurious to the public health, safety, morals and welfare of the residents of the state, and the findings and declarations made before August 3, 1955 in s. 66.43 (2) are in all respects affirmed and restated; that while certain slum, blighted or deteriorated areas, or portions thereof, may require acquisition and clearance, as provided in s. 66.43, since the prevailing condition of decay may make impracticable the reclamation of the area by conservation or rehabilitation in such a manner that the conditions and evils hereinbefore enumerated may be eliminated, remedied or prevented, and to the extent feasible salvable slum and blighted areas should be conserved and rehabilitated through voluntary action and the regulatory process; and all acts and purposes pro-

vided for by this section are for and constitute public uses and are for and constitute public purposes, and that moneys expended in connection with such powers are declared to be for public purposes and to preserve the public interest, safety, health, morals and welfare. Any municipality in carrying out the provisions of this section shall afford maximum opportunity consistent with the sound needs of the municipality as a whole to the rehabilitation or redevelopment of areas by private enterprise." [2]

The city of Milwaukee, in almost identical language, found such conditions to exist in its housing ordinance:

"It is hereby found and declared that premises exist within the City of Milwaukee which are blighted because there exist thereon blighted buildings or other structures, either occupied or unoccupied by human beings, and such buildings or other structures are blighted because faulty design or construction, or failure to keep them in a proper state of repair, or lack of proper sanitary facilities, or lack of adequate lighting or ventilation, or inability to properly heat, or improper management, or any combination of these factors has resulted in such buildings or structures becoming so deteriorated, so dilapidated, so neglected, so overcrowded with occupants, or so insanitary as to jeopardize or be detrimental to the safety, morals, or welfare of the people of the city. It is hereby further found and declared that such blighted premises and such blighted buildings or other structures contribute to the development of, or increase in, disease, infant mortality, crime, and juvenile delinquency; that conditions existing on such blighted premises are dangerous to the safety, morals, and general welfare of the people; that conditions existing on such blighted premises necessitate excessive and disproportionate expenditure of public funds for public safety, crime prevention, fire protection, and other public services; that the conditions existing on such blighted premises cause a drain upon public revenue and impair the efficient and economical exercise of governmental functions in such areas. It is hereby further found and declared that the elimination of blighted premises and the prevention of occurrence of

[2] Several other statutes recognize like housing conditions. *See* secs. 66.40, 66.405, 66.43 and 66.431, Stats.

blighted premises in the future is in the best interests of the citizens of this city, of the State of Wisconsin, and of the entire United States; and that the accomplishment of this end will be fostered and encouraged by the enactment and enforcement of this ordinance. The enactment and enforcement of this ordinance is hereby declared to be essential to the public interest, and it is intended that this ordinance be liberally construed to effectuate the purposes as stated heretofore in this ordinance." (Sec. 75, part 2)

This court, heretofore, has taken cognizance of the legislative policy in the area of urban blight and housing code regulations. In *Pines v. Perssion* (1961), 14 Wis. 2d 590, 595, 596, 111 N. W. 2d 409, the court stated:

"Legislation and administrative rules, such as the safeplace statute, building codes, and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment—that it is socially (and politically) desirable to impose these duties on a property owner—which has rendered the old common-law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliché, *caveat emptor*. Permitting landlords to rent 'tumble-down' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency, and high property taxes for conscientious landowners."

It is our opinion that public policy as espoused in ch. 66, Stats., clearly indicates that the legislature intended that housing code violations should be reported. If a landlord could terminate a tenancy solely because his tenant had reported a violation the intention of the legislature would be frustrated.

In a case decided by the United States Court of Appeals, District of Columbia, *Edwards v. Habib* (1968),

397 Fed. 2d 687, 701, 702, involving almost the identical problem, the court stated:

"In trying to effect the will of Congress and as a court of equity we have the responsibility to consider the social context in which our decisions will have operational effect. In light of the appalling condition and shortage of housing in Washington, the expense of moving, the inequality of bargaining power between tenant and landlord, and the social and economic importance of assuring at least minimum standards in housing conditions, we do not hesitate to declare that retaliatory eviction cannot be tolerated. There can be no doubt that the slum dweller, even though his home be marred by housing code violations, will pause long before he complains of them if he fears eviction as a consequence. Hence an eviction under the circumstances of this case would not only punish appellant for making a complaint which she had a constitutional right to make, a result which we would not impute to the will of Congress simply on the basis of an essentially procedural enactment, but also would stand as a warning to others that they dare not be so bold, a result which, from the authorization of the housing code, we think Congress affirmatively sought to avoid.

"The motion that the effectiveness of remedial legislation will be inhibited if those reporting violations of it can legally be intimidated is so fundamental that a presumption against the legality of such intimidation can be inferred as inherent in the legislation even if it is not expressed in the statute itself."

In addition it was said in *Edwards v. Habib, supra,* pages 699–701:

". . . while the landlord may evict for any legal reason or for no reason at all, he is not, we hold, free to evict in retaliation for his tenant's report of housing code violations to the authorities. As a matter of statutory construction and for reasons of public policy, such an eviction cannot be permitted.

". . . the codes obviously depend in part on private initiative in the reporting of violations. . . To permit retaliatory evictions, then, would clearly frustrate the effectiveness of the housing code as a means of upgrading the quality of housing . . . ."

We likewise conclude that a landlord may terminate a tenancy at will or from month to month (or lesser periods) for any legitimate reason or no reason at all, but he cannot terminate such tenancy simply because his tenant has reported an actual housing code violation as a means of retaliation.

We therefore hold that the defendant can raise the defense of retaliatory eviction. To be successful in this defense, however, he must prove by evidence that is clear and convincing that a condition existed which in fact did violate the housing code, that the plaintiff-landlord knew the tenant reported the condition to the enforcement authorities, and that the landlord, for the sole purpose of retaliation, sought to terminate the tenancy.

A question was raised at oral argument regarding the repercussions in landlord-tenant law of the creation of a defense of retaliatory eviction. It was observed that the logical extension of such a rule would be to create a permanent tenancy as long as a jury could be convinced of the landlord's evil motive. The analysis of the District of Columbia Court of Appeals in *Edwards v. Habib, supra,* pages 702, 703, tends to shed some light on this problem:

"This is not, of course, to say that even if the tenant can prove a retaliatory purpose she is entitled to remain in possession in perpetuity. If this illegal purpose is dissipated, the landlord can, in the absence of legislation or a binding contract, evict his tenants or raise their rents for economic or other legitimate reasons, or even for no reason at all. The question of permissible or impermissible purpose is one of fact for the court or jury, and while such a determination is not easy, it is not significantly different from problems with which the courts must deal in a host of other contexts, such as when they must decide whether the employer who discharges a worker has committed an unfair labor practice because he has done so on account of the employee's union activities. As Judge Greene said, 'There is no reason why similar factual judgments cannot be made by courts

and juries in the context of economic retaliation [against tenants by landlords] for providing information to the government.' "

*By the Court.*—Judgment reversed and a new trial ordered consistent with this opinion. No costs to be awarded because of failure to comply with the rule set forth in sec. (Rule) 251.38 (1), Stats.

ROBERT W. HANSEN, J. (*dissenting*). Rent control returns to Wisconsin, this time by judicial edict. State level rent control legislation in this state had two principal effects: (1) It proscribed rent increases; (2) it placed limitations upon the right of landlords to terminate tenancies.[1] Such state level rent control law expired in 1949, and has not been reenacted. In fact, no suggestion has been made nor action taken by the legislature to reimpose such restrictions.[2]

Since 1949, it has been the law in Wisconsin, as it was before the rent control law interim, that a month-to-month tenancy can be terminated by either landlord or tenant, for any reason at all or for no reason at all, by the giving of at least thirty days' notice in writing of termination.[3]

It remains the law in Wisconsin, as the legislature has provided, that any tenant may terminate a month-to-month tenancy by giving at least thirty days' written notice that he shall remove from the premises. His reasons for so doing are immaterial. In fact, he need have or give no reason at all.

[1] Sec. 234.26, ch. 442, Laws of 1947, entitled "Emergency Control of Rentals," enacted in 1947 legislative session, and by its provisions, remained in effect until April 1, 1949.

[2] Assembly Bill 654 passed both houses of the Wisconsin legislature at the 1969 session. It contains new statutory provisions relating to the landlord-tenant relationship, but does not add the new defense to unlawful detainer actions created by the majority opinion.

[3] Sec. 234.03, Stats.

It now becomes law in Wisconsin, well beyond the clear language of the applicable statute, that a landlord may not terminate a month-to-month tenancy by giving thirty days' written notice that the tenant is to remove from the premises, if he is motivated by the tenant's having filed a complaint against the landlord with local authorities. If such be the motivation, the thirty-day notice is invalid and the tenant stays on. It is certainly predictable that, so motivated, the landlord may not increase the rent. So the tenant remains in the same premises at the same rental, with a tenure that is something more than a month-to-month tenancy, whether the landlord likes it or not.

There are those who identify solely with the problems of tenants, particularly those in large metropolitan areas, in securing adequate housing at reasonable rates. They will applaud the sociological effect of this judicially imposed restriction upon a landlord's right to terminate a month-to-month tenancy under these circumstances.

There are those who identify primarily with the problems facing landlords, particularly owners of duplexes and smaller housing units in large metropolitan areas, who are struggling to pay heavy property tax levies and maintain their properties without going in the red. They will be much less enthusiastic about this court-imposed limitation on a landlord's right to terminate a tenancy.

There are those who will view this decision with a wider perspective. Citizens who respect the division between legislative, executive and judicial functions in our form of government will and should, in this writer's opinion, be appalled at this clear example of judicial lawmaking. Our government, including its state level, is divided into three branches. The legislative branch is to enact the laws that determine questions of basic public policy. The executive branch is to administer such laws. The judicial branch is to interpret, apply and constitutionally test them. When an appellate court amends

a law to give it an application, contrary to the plain meaning of the words used in the statute, the judicial invasion of the legislative field is obvious. A spike has been driven for the railroad track that leads away from the checks and balances inherent in our tripartite form of government.

Here we do not deal with the matter of broad or narrow interpretation of constitutional provisions or protections, always tersely stated and seldom specifically spelled out. The Law Reform Division, Milwaukee Legal-Plan Services, which brings this appeal on behalf of an ex-tenant, does contend that sec. 234.03, Stats., relating to the termination of tenancies, is unconstitutional. However, that issue is not reached in the majority opinion, and not dealt with in this dissent.

Nor do we here deal with the right of the legislature to place reasonable restrictions upon the use of property for the promotion of the general welfare, reasonably calculated to safeguard public health and safety.[4] Actually, a number of state legislatures have limited the right of a landlord to terminate a tenancy where a complaint has been made against such landlord by such tenant.[5] If the Wisconsin legislature had made the policy judgment involved—that it is socially desirable to impose this limitation upon landlords—the case would be clear.[6] For

[4] *State v. Dried Milk Co-operative* (1962), 16 Wis. 2d 357, 114 N. W. 2d 412; *State v. Voshart* (1968), 39 Wis. 2d 419, 435, 159 N. W. 2d 1.

[5] *See* ch. 80, sec. 71, Illinois Revised Statutes; ch. 215, New Jersey Laws 1967; ch. 55, Laws 1968, House Bill No. 1606, Rhode Island; Michigan Public Act 1968, 297; Maryland Laws of 1969, ch. 223. (cited in appellant's brief.)

[6] "Legislation and administrative rules, such as the . . . building codes, and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment—that it is socially (and politically) desirable to impose these duties on a property owner—which has rendered the old common-law rule obsolete. . . ." *Pines v. Perssion* (1961), 14 Wis. 2d 590, 595, 596, 111 N. W. 2d 409.

the court to do what the legislature did not do is a something else, or should be.

The invitation to the court to do what the legislature did not do is set forth in appellant's brief thusly: ". . . it is the task of the Court to determine what the legislature would have done in the light of the purpose and effect of the statute, if it had been faced with the problem now before the Court." It is difficult to imagine a more incorrect description of the role of the courts in interpreting and applying statutes. It is what the legislature did do, not what they might have done, that is before us. There is an area for interpreting legislative actions or intent, liberally or not so liberally, although where meaning of words is clear there is nothing to be interpreted.[7] However, there is no right of a court to say if the legislature knew then what we know now, they would have done differently, and proceed to substitute such different law for the one actually enacted by the legislature. That makes the court a super-legislature, not a reviewing court at all.

The majority opinion does not travel the full route suggested by appellant. It finds in a general policy statement, enacted as part of a different statute, a legislative intent to change the sec. 234.03 procedure. In so doing, it sets forth and relies upon the subsection labeled "Findings," incorporated in sec. 66.435, Stats. (the Urban Renewal Act), dealing with the acquisition and clearance of slum, blighted or deteriorated areas. This subsection (2) is clearly intended to warrant and justify the expenditure of public funds for eliminating or remedying slum conditions by setting forth the public purpose served

---

[7] ". . . While the legislative intent may have been otherwise . . . yet it is not within the province of this court to seek secondary sources of legislative intent where the meaning of the statute is plain and unambiguous." *West Side Bank v. Marine Nat. Exchange Bank* (1968), 37 Wis. 2d 661, 669, 670, 155 N. W. 2d 587; *see also Miller v. Wadkins* (1966), 31 Wis. 2d 281, 142 N. W. 2d 855; *State v. Caruso* (1969), 44 Wis. 2d 696, 172 N. W. 2d 195.

by such expenditures. The subsection is a part of the specific statute in which it is located. It does not reach out to alter or amend enactments in other sections of the statute book. Such general findings and declarations of policy undergird and explain the specific enactments by the legislature of which they are a part. They are not a delegation to the judicial branch to alter, amend or repeal all statutory provisions that the court feels do not sufficiently forward the public purpose or public need set forth.

The Wisconsin Family Code begins with a statement of broad public policy, favoring the maintenance of stable family life in this state.[8] Does this have any effect upon the specific grounds for divorce established by the legislature? May a court find any or all of such grounds inconsistent with the broadly stated declaration of public policy that family stability is a public good. The answer is, No. Divorce remains a creature of statute, and litigants are entitled to look to the statutory provisions as enacted to determine their rights.[9]

There is a long-standing rule of construction in this state that the Workmen's Compensation Act be liberally construed to further its beneficent purposes.[10] Does this entitle a court to find a clear and precise procedural requirement invalid because it does not further such public purpose of the Act? Can a court grant compensation, where there is no statutory provision for so doing, in order to effectuate the liberal construction of the public purpose? Of course not. The provisions of the compensation act are to be liberally construed, but this is no delegation to the courts of any power to alter, amend, or

[8] Sec. 245.001 (2), Stats.

[9] *Reading v. Reading* (1954), 268 Wis. 56, 66 N. W. 2d 753; *O'Neill v. O'Neill* (1962), 17 Wis. 2d 406, 117 N. W. 2d 267.

[10] *Waunakee Canning Corp. v. Industrial Comm.* (1955), 268 Wis. 518, 68 N. W. 2d 25; *State v. Industrial Comm.* (1958), 4 Wis. 2d 472, 90 N. W. 2d 397; *Grant County Service Bureau v. Industrial Comm.* (1964), 25 Wis. 2d 579, 131 N. W. 2d 393.

suspend the specific statutory requirements for recovery.[11]

The majority opinion quotes approvingly a Washington, D. C., case in which the author, Judge J. SKELLY WRIGHT, makes controlling ". . . the social context in which our decisions will have operational effect." [12] This is fancy language for substituting presumed sociological benefits for a legal interpretation of legislative enactments and intents. It transfers to the courts a policy-deciding function constitutionally delegated to the legislative branch of our government. It is the legislature, the branch of government most responsive and responsible to the will of the people, that is to decide issues of public policy ". . . in the social context in which our decisions will have operational effect." Courts are neither constitutionally authorized nor well-equipped to determine the public policy in areas of debate and controversy. That is the legislative, not the judicial, function.

Perils along this course for courts are exemplified by Judge WRIGHT'S listing ". . . the inequality of bargaining power between tenant and landlord," as a factor to be considered in interpreting the provisions of a legislative enactment. Applied to the corporate owner of a multimillion-dollar high-rise in the nation's capital, the Goliath-David comparison is apt, although Goliaths don't always win. Applied to the retired pensioner or workingman owner of a Milwaukee duplex, the giant-pygmy analogy does not hold, particularly with groups such as the Law Reform Division, Milwaukee Legal-Plan Services enlisted on the side of tenant power. The sequence of events in this case shows the hurdles the respondent-

[11] "Appellants' last contention is that public policy requires a reversal. But workmen's compensation is wholly statutory and questions of what should be public policy concerning it are determined by the legislature. . . ." *Harry Crow & Son, Inc. v. Industrial Comm.* (1963), 18 Wis. 2d 436, 442, 118 N. W. 2d 841.

[12] *Edwards v. Habib* (D. C. Cir. 1968), 397 Fed. 2d 687, 701.

landlord faced and still faces in implementing a thirty-day notice to terminate a month-to-month tenancy:

*May 31, 1968:* Landlord served thirty-day notice to terminate tenancy.

*July 9, 1968:* Landlord commenced unlawful detainer action in county court.

*July 26, 1968:* Landlord secured judgment following trial in county court.

*October 11, 1968:* Trial de novo on tenant's appeal to circuit court. Landlord granted judgment.

*November 3, 1968:* Tenant vacated premises in lieu of filing appeal bond which would have permitted him to remain in premises.

*December 1, 1969:* On appeal, case argued in supreme court.

*January 9, 1970:* Case remanded to circuit court for new trial. In the record is the tenant's demand for a jury trial, so the end is not yet. More chapters remain to be added to the book.

It is not the sharpness of the sword placed in the tenant's hands as much as the expense of raising the shield of defending costly court proceedings that makes "inequality" a doubtful description of the relationship between the parties in this case.

Actually, the vacation of the premises by the appellant back in 1968 makes this entire controversy moot, meaning that in reality there no longer is a true controversy existing.[13] Appellant no longer has an existing right which the judgment substantially affects. The law reform division attorney argues that the case is saved from mootness because the costs in the county court ac-

[13] "'. . . this court (will not) entertain an appeal unless the appellant has an existing right which the order or judgment appealed from, if erroneous, has substantially prejudiced.'" *Doering v. Swoboda* (1934), 214 Wis. 481, 484, 253 N. W. 657. *See also Wisconsin Employment Relations Board v. Allis-Chalmers Workers' Union* (1948), 252 Wis. 436, 440, 31 N. W. 2d 772, 32 N. W. 2d 190.

tion are involved. These costs amount to $5.60. While liability for costs can preserve a case,[14] if this alone is always enough, the door is open insisting upon review of judgments which have no practical effect upon the rights of the parties involved. In two recent cases involving elections, the high court of the land dismissed appeals, holding the issues raised to be moot because the election was over.[15] In both it can be assumed the costs amounted to more than $5.60, but both cases were dismissed as moot. The law reform system staff did not attempt here to bring a class action on behalf of appellant and other tenants similarly situated, present and future. Since it did not do so, the case it did bring is moot and has been since November 3, 1968.

The judgment of the trial court should be affirmed, or, in the alternative, the appeal should be dismissed for the reason that the case is moot.

I am authorized to state that Mr. Justice LEO B. HANLEY concurs in this dissenting opinion.

[14] *Smith v. Whitewater* (1947), 251 Wis. 306, 309, 29 N. W. 2d 33.

[15] *Brockington v. Rhodes* (1969), 396 U. S. 41, 90 Sup. Ct. 206, 24 L. Ed. 2d 209; *Hall v. Beals* (1969), 396 U. S. 45, 90 Sup. Ct. 200, 24 L. Ed. 2d 214.