COURT OF APPEALS
DECISION
DATED AND FILED

February 1, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2022AP925**

STATE OF WISCONSIN

Cir. Ct. No.  **2021SC3016**

**IN COURT OF APPEALS
DISTRICT II**

M.R. COMMERCE BUILDING, LLC,

   PLAINTIFF-RESPONDENT,

V.

TLM DEVELOPMENT LLC,

   DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Racine County: JON E. FREDRICKSON, Judge. *Affirmed and cause remanded*.

¶1     NEUBAUER, J.[1]  TLM Development LLC appeals from an order evicting it from a commercial building in Mount Pleasant, Wisconsin.  TLM

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(a) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

entered into leases for space in the building with M.R. Commerce Building, LLC in early 2021. TLM also signed an offer to purchase the building, but the parties' efforts to close the sale eventually broke down. M.R. Commerce subsequently commenced this action seeking to evict TLM for nonpayment of rent and collect damages. TLM raised several defenses, including that the parties had orally modified the leases to excuse its rent obligation while the sale was pending and that the eviction was unlawfully retaliatory. Following a one-day bench trial, the trial court rejected TLM's defenses and entered writs of restitution to evict TLM. This court affirms and remands for further proceedings with respect to M.R. Commerce's claimed damages.

## BACKGROUND

### I. The Leases and Offer to Purchase

¶2      The following background is taken from the testimony and exhibits received at trial. TLM, owned by Tammy Lynn Myers, and M.R. Commerce, owned by Medhat A. Rizk, entered into several agreements related to a commercial building owned by M.R. Commerce.[2] First, the parties signed three leases under which TLM was to rent various suites in the building. Two of the leases stated that they were executed on January 21, 2021, and the five-year lease term of each would begin on February 1, 2021. The third lease, which also provided for a five-year term, stated that it was executed on February 24, 2021, and would begin on March 1, 2021.

---

[2] Myers and Rizk were the only witnesses to testify at trial.

¶3    The parties made handwritten additions to certain provisions in the leases. Underneath Section 3 in one of the leases beginning February 1, which specified a monthly rent of $4,600, the parties added the following handwritten text: "$2,500/mo for 1st 90 days." A similar handwritten addition appears underneath Section 3 of the other lease beginning February 1, which specifies a monthly rent of $2,016: "$1,000/mo for 1st 90 days." The lease beginning March 1, which specifies a monthly rent of $1,900, contained the following handwritten text below the rent provision: "accept as Paid for 90 days." Along with these handwritten terms, the parties added handwritten language to each lease waiving the payment of a security deposit for ninety days.

¶4    The parties also signed an offer to purchase, dated January 23, 2021, under which TLM would buy the building subject to several contingencies, including TLM obtaining financing for the purchase within sixty days. Per the terms of the offer, closing was to occur within forty-five days "after satisfaction or waiver of the last outstanding contingency."

¶5    Myers and Rizk provided inconsistent accounts regarding how these agreements came about. Myers testified that she was in need of space for her business and initially discussed buying the building with Rizk. After agreeing on a price, Myers and Rizk drew up the offer to purchase, Rizk prepared the leases, and the two signed all four documents at the same time. Regarding the need for the leases, Myers explained that Rizk wanted to review the offer to purchase and "then at that time he told me he wanted me to sign leases. I said I don't need to sign leases; I'm buying the building. He said well I want leases signed. And he said it doesn't matter, you're buying the building anyway. And I said okay." Myers testified that she and Rizk signed all of the documents on January 23, 2021, the same day Myers wrote two checks, one for the earnest money for the potential

sale of the building and the second for $10,500.00, which she described as part of "our agreement that I would give him $10,500 and that would cover [rent] through closing."

¶6     Rizk, in contrast, testified that the "selling [of] the office building was separate from the leases." According to him, Myers signed the leases on January 21, returned with the offer to purchase two days later, and their discussions concerning the leases and the sale were not related.

## II.     Additional Documents Concerning the Sale

¶7     In the months that followed, the parties signed additional documents related to the proposed sale. On February 17, 2021, Rizk signed a document in which he agreed to provide partial financing for the transaction. According to Rizk, this document came about after a small business loan Myers had pursued fell through and a second potential source of financing demanded that she put up twenty-five percent of the purchase price.

¶8     On April 26, 2021, Myers and Rizk signed an amendment to the offer which extended the closing date to June 14, 2021. Rizk testified that he and Myers discussed TLM's rent in May and that Myers questioned why she needed to pay rent given that she was in the process of purchasing the building. Rizk testified that he told her that paying rent "has nothing to do with buying the building. I have to pay taxes, I have to pay insurance, I have to pay maintenance. There's a lot of expenses for the building." He testified that he continued to demand payment of rent over the summer, but not in writing.

¶9     Myers denied that Rizk made any demands for rent and testified that between April 26 and June 14, her discussions with him about rent "were that our

original agreement would stand. The rent I already paid would be enough." She explained that "financing [and] everything was in place" for the purchase but they extended the closing date because "we were waiting on the appraisal."

¶10     On June 3, 2021, Rizk signed a second seller financing document on behalf of M.R. Commerce in which he agreed to hold a second mortgage on the property, guaranteed by Myers, in the amount of $387,500 (twenty-five percent of the purchase price). By its terms, this agreement "supersede[d] any previous agreement." Though he claimed that TLM was behind on its rent when he signed the document, Rizk signed it hoping it would enable Myers to secure financing to close the sale.

¶11     Three weeks later, on June 24, Myers and Rizk signed a second amendment to the offer to purchase, which further extended the closing date to July 2. Myers testified that Rizk made no demands for payment of rent between the prior extended closing date, June 14, and the new closing date, July 2.

### III.     Unsuccessful Efforts to Close the Sale

¶12     The parties did not close the sale by July 2 and offered different explanations at trial. Rizk testified that Myers asked him to agree to a third extension of the closing date, but he refused because she had not been able to secure financing. Myers, in contrast, testified that Rizk refused to sign the extension, but "said he would get it to me later," and then never did despite several attempts on her part to obtain it.

¶13     Notwithstanding his refusal to sign another extension, Rizk testified that Myers called him on July 6 and informed him that the closing would occur the next day and that she had obtained financing at a "very, very high [interest] rate"

that Rizk did not believe she would be able to repay. By that time, he had decided that he would not provide financing to facilitate the sale.

¶14 Myers disagreed with much of Rizk's account. She testified that she obtained a letter conditionally confirming financing for the purchase on April 2, which she gave to Rizk that same day. The letter identified a loan amount of $1,085,000.00 (about seventy percent of the purchase price less the earnest money) and an interest rate of 8.99%.[3] She testified that Rizk was happy to receive it and expressed an interest in closing "soon." But she also acknowledged that Rizk told her "he was nervous about whether [she] could make the payments or not" because of the interest rate and that he advised her to "seek other financing."

¶15 According to Myers, the closing did not occur in June because Rizk did not provide necessary documents to the title company. In support, Myers introduced into evidence an email from the title company handling the closing dated June 22, 2021, requesting documents from M.R. Commerce. Myers also testified that she learned that Rizk "wasn't responding to his emails and his phone calls" during this time. She acknowledged that Rizk "got his last piece of documentation into the closing company on July 1st," but because that did not give the title company enough time to close on July 2, the closing was moved to July 7. Myers went to the title company's office on July 7 with the funds necessary to close but Rizk did not show up. In the following weeks, at Rizk's suggestion, Myers sought other sources of secondary financing but was unable to

---

[3] This appears to be the "very, very high rate" Rizk referred to in his testimony.

secure it. Myers testified that Rizk "told [her] that it was his fault that it didn't close. And that he had no intention of charging me rent."

¶16    In a letter dated October 8, 2021, Rizk informed TLM that it had until the end of that month "to bring the financing to close." The letter also itemized the outstanding rent owed under each of the three leases, which totaled $54,800.00, which Rizk expected to be paid immediately. The parties did not close the sale, which is currently the subject of another lawsuit pending in the circuit court. *Myers v. Rizk*, Racine County Circuit Court Case No. 2022CV246.

¶17    Rizk later prepared and delivered to Myers a notice to vacate the premises, which he signed and dated October 16, 2021. When TLM did not vacate or pay the allegedly overdue rent, M.R. Commerce commenced this eviction action.

### IV.    The Trial Court's Decision

¶18    Following trial, the trial court issued a written decision in favor of M.R. Commerce. After discussing the rental terms in the leases, the court found that TLM had not paid rent since the first ninety days. The court rejected TLM's contention that the parties orally modified the leases to relieve TLM of the obligation to pay rent. On this point, the court found Rizk's testimony credible and Myers' testimony not credible.

¶19    The trial court also rejected TLM's retaliatory eviction defense. Myers testified at trial that Rizk "began getting a little more and more overly friendly early in our relationship" and, in late June or early July, told Myers he would evict TLM if she did not have sex with him. Rizk denied making any sexual advances towards Myers and testified that she made advances towards him

in order to get him to sign the third closing extension.  The court rejected TLM's defense for two reasons.  First, it found Myers' assertion that Rizk had asked her for sex not credible.  Second, the court stated that Wisconsin does not recognize a retaliatory eviction defense in the commercial setting.[4]  As a result, the court entered writs of restitution for the return of the leased premises to M.R. Commerce and stayed proceedings with respect to M.R. Commerce's damages because they "potentially intertwine with the damages" in the parties' other lawsuit.[5]  TLM appeals.

## DISCUSSION

¶20    TLM contends that the trial court erred in finding that Myers and Rizk did not orally modify the leases to relieve TLM of its obligation to pay rent (other than the $10,500.00 paid for the first ninety days) through closing.  TLM argues that the court's finding rests on its erroneous determination that Rizk's testimony on this point was more credible than that of Myers.  In support, TLM marshals a handful of instances in which Rizk's testimony purportedly conflicted with documentary evidence or Myers' testimony and describes him as "an unreliable, and therefore incredible, witness."

¶21    These snippets fall far short of the showing necessary to reverse the trial court's credibility finding.  "When the trial court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and of the weight to be given

---

[4] The trial court also rejected TLM's argument that the notice to vacate was defective under WIS. STAT. § 704.17.  TLM does not raise this as a ground for reversal on appeal.

[5] Proceedings in the other lawsuit between the parties pertaining to the purchase of the building are not at issue in this appeal.

to each witness's testimony." ***Lessor v. Wangelin***, 221 Wis. 2d 659, 665, 586 N.W.2d 1 (Ct. App. 1998). This rule rests on the trial court's "superior opportunity … to observe the demeanor of [the] witnesses and to gauge the persuasiveness of their testimony." ***Johnson v. Merta***, 95 Wis. 2d 141, 152, 289 N.W.2d 813 (1980) (citation omitted). In contrast, this court can only review "the cold, hard type of a printed record," ***Ianni v. Grain Dealers Mut. Ins. Co.***, 42 Wis. 2d 354, 361, 166 N.W.2d 148 (1969), which seldom furnishes a sufficient basis to evaluate credibility:

> [An appellate court's] consideration is limited to the written word and rarely can credibility be judged by words alone. More often, credibility, or lack thereof, is revealed by a close examination of the witness's demeanor. The cold record does not reflect the witness's demeanor and all its facets; the circuit court has the advantage of observing them.

***State v. McCallum***, 208 Wis. 2d 463, 479-80, 561 N.W.2d 707 (1997). Accordingly, this court may not reweigh the credibility of the witnesses and must accept the trial court's determination unless it is "'inherently or patently incredible,' or 'in conflict with the uniform course of nature or with fully established or conceded facts.'" ***Nicholas C.L. v. Julie R.L.***, 2006 WI App 119, ¶23, 293 Wis. 2d 819, 719 N.W.2d 508 (quoting ***Chapman v. State***, 69 Wis. 2d 581, 583, 230 N.W.2d 824 (1975)).

¶22 TLM does not acknowledge this standard, and the purported inconsistencies in Rizk's testimony it highlights are not enough to meet it. The evidence that pertained most directly to the existence of an oral modification was the conflicting testimony of Myers and Rizk. The trial court could have found, based on the testimony TLM cites in attempting to discredit Rizk, that Myers' testimony on this point was more credible. But that is not enough to carry the day

for TLM. The existence of an oral agreement was not a "fully established or conceded fact[]," and the trial court's determination that Rizk was more credible is not "inherently or patently incredible." *See Chapman*, 69 Wis. 2d at 583. To the contrary, it is entirely reasonable to believe that Rizk did not agree to indefinitely relieve TLM of its substantial monthly rental obligations as the closing process dragged on for months. The conflicting accounts given by Myers and Rizk require this court to defer to the trial court's credibility determination and leave undisturbed that court's finding that the parties did not agree to modify the leases.

¶23 TLM's other argument concerns the issue of retaliatory eviction. Our supreme court recognized retaliation as a defense to eviction in *Dickhut v. Norton*, 45 Wis. 2d 389, 173 N.W.2d 297 (1970). There, it held that a tenant could raise as a defense in an eviction proceeding that the landlord sought to evict the tenant in retaliation for the tenant having reported the landlord for violating the housing code. *Id.* at 399. Six years later, the court emphasized the limited scope of the defense it recognized in *Dickhut*: "Although retaliation is recognized as a defense to eviction in this state, the judicial adoption of the rule has been limited by policy to evictions from residential housing solely because of complaints of housing code violations." *Rossow Oil Co. v. Heiman*, 72 Wis. 2d 696, 707-08, 242 N.W.2d 176 (1976).

¶24 Several years later, the Wisconsin legislature enacted WIS. STAT. § 704.45, which prohibits landlords from evicting residential tenants for exercising certain rights. *See* 1981 Wis. Laws, ch. 286, § 7. Though the statute enlarged the grounds upon which a retaliatory eviction defense can be asserted, it expressly applies only to "a landlord in a residential tenancy." Sec. 704.45(1). As TLM acknowledges, neither the legislature nor any published Wisconsin decision since the statute's enactment has extended the defense to commercial tenancies.

10

¶25 TLM grounds its argument for expansion of the defense in a California case, ***Custom Parking, Inc. v. Superior Court***, 187 Cal. Rptr. 674 (Cal. Ct. App. 1982), in which the court held that a commercial tenant could raise a retaliatory eviction defense based on the allegation that a landlord sought to evict a commercial tenant whose employees refused to give perjured testimony in a lawsuit involving the landlord and other tenants. This court cannot ignore the clear and express limitation on the defense recognized by the Wisconsin legislature and our supreme court. Absent an argument that is grounded in Wisconsin law, this court declines TLM's invitation to extend the defense to commercial tenants.[6]

¶26 For these reasons, this court affirms the trial court's order and remands this case for further proceedings with respect to M.R. Commerce's claimed damages.

*By the Court.*—Order affirmed and cause remanded.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[6] This decision makes it unnecessary for this court to address TLM's challenge to the trial court's finding that Myers' testimony concerning the alleged retaliatory motive was not credible. *See* ***Sweet v. Berge***, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (when one issue is dispositive of an appeal, this court need not reach other issues).

11