ROSSOW OIL COMPANY, INC., Respondent, v. HEIMAN, Appellant.

*No. 75–35. Argued May 4, 1976.—Decided June 2, 1976.*
(Also reported in 242 N. W. 2d 176.)

698

For the appellant there were briefs and oral argument by *James A. Hauer* of Elm Grove.

For the respondent there was a brief by *Stevens L. Riley* and *Losby, Riley & Farr, S. C.* of Eau Claire, and oral argument by *Stevens L. Riley*.

HANLEY, J. Five issues are presented on this appeal:

1. Does the existence of a franchise or dealership arrangement, absent statutory provisions, preclude the use of summary eviction from real property?

2. Are the dealership regulations of ch. 135, Stats., in effect for the arrangement existing here?

3. Has the appellant established a valid counterclaim for damages arising from the eviction due to a fiduciary relationship or statutory duty?

4. Has the appellant established a valid and cognizable counterclaim for damages under federal regulations?

5. Is promissory estoppel available as a counterclaim remedy in this case?

*General franchise law.*

As one aspect of his defense at trial, appellant-Heiman attempted to establish that the relationship between himself and Rossow Oil Company involved more than a mere lease agreement. Evidence of the marketing by Heiman of gasoline, tires, batteries, and accessories in 1974 under a trade name apparently owned by the respondent was offered as proof of a franchise or distributorship arrangement. Reference is made on appeal to similar activity for Gulf Oil since 1967, but the testimony rather established that Myron S. Rossow was the independent distributor for Gulf during that time and that he formed the corporate respondent oil company in 1974 to purchase Gulf's interest. His past actions as an agent for Gulf are immaterial to the subsequent relationship between Heiman and the respondent.

This arrangement was shown for the purpose of raising an asserted fiduciary relationship which, it is argued,

prevents termination of the franchise without a showing of good cause for the deprivation of vested rights.

Disregarding for the moment the question of the actual application of statutory law on the subject, some courts have found that a failure to show good cause for a franchise termination prevents summary eviction actions. *See: Shell Oil Company v. Marinello* (1972), 120 N. J. Super. 357, 294 Atl. 2d 253, affirmed (1973), 63 N. J. 402, 307 Atl. 2d 598, certiorari denied 415 U. S. 920, 94 Sup. Ct. 1421, 39 L. Ed. 2d 475; *Mobil Oil Corporation v. Rubenfeld* (1972), 72 Misc. 2d 392, 339 N. Y. Supp. 2d 623, affirmed (1974), 77 Misc. 2d 962, 357 N. Y. Supp. 2d 589. In *Shell,* legislation inapplicable because its effective date was found to codify existing state common law and public policy on the matter.

These concepts, however, were considered and rejected by this court in the recent decision of *Clark Oil & Refining Corp. v. Leistikow* (1975), 69 Wis. 2d 226, 230 N. W. 2d 736. Collateral obligations arising because of franchising or dealership arrangements were there viewed as governed solely by legislation which under the facts of that case were either clearly not applicable or were pertinent only as to arrangements made after the effective date of the law.

*Application of chapter 135.*

Is such legislation, specifically ch. 135, Stats., effective here? If so, appropriate sections require the grantor of a dealership to give an explanatory notice 90 days prior to the date of a termination or a "substantial change in competitive circumstances." Sec. 135.04, Stats. Even if Rossow Oil Company were willing to continue to supply products to Heiman, the ouster from the established location certainly qualifies under the record here as such a change. The law further provides that the grantor must not make such adjustments without "good cause."

Sec. 135.02 (6), Stats. A violation of the chapter by the grantors allows the dealer an action for damages or injunctive relief. The significant requirement of "good cause" is applicable, however, only to those dealerships entered into after April 5, 1974. Sec. 135.03, Stats.

Chapter 135 was disregarded by the trial court because it found it vague and did not believe it applied to small organizations such as Rossow. It is clear that these statutory provisions were enacted for the protection of the interests of the dealer, whose economic livelihood may be imperiled by the dealership grantor, whatever its size.

In review, the circuit court disregarded the trial court's construction and concentrated on the question of whether Heiman's dealership agreement with Rossow preceded the effective date of the statute. From the testimony on the record, the circuit court found that Heiman and the respondent entered into a month-to-month or periodic leasing agreement in January of 1974. Although the appellant offered testimony that the agreement also embraced distributorship matters, there was no contradiction that a periodic tenancy of month-to-month existed. The record shows that Gulf's specific lease with Heiman had earlier ceased and that Gulf had allowed holdover use in the nature of a periodic tenancy. *See:* sec. 704.01 (4), Stats. When Rossow obtained the station, he apparently mentioned that a contract would be provided in the future, but it is undisputed that use in the interval was agreed to continue on the same terms and circumstances as existed during the holdover after the Gulf lease. The fact that similar terms were involved hardly makes the January 1974 agreement a renewal or extension of the prior tenancies, especially when a new lessor is involved.

Heiman cannot now dispute that a periodic tenancy was found from the testimony in the trial court. The ap-

pellant instead submits that each month after January was a separate and new lease, such that the monthly tenancy of May 1974, when notice of termination was given, was a dealership agreement entered into after the effective date of ch. 135, Stats.

We recognize that there is a split among the authorities who have considered the question of whether a periodic tenancy is a series of individual and new tenancies rather than a continuing tenancy subject to termination at definite intervals. However, we hold that a periodic tenancy is one continuing tenancy subject to termination at various rental periods. This result comports with our property legislation, which acknowledges that periodic tenancy may arise in a number of ways. *See:* Committee Comment—1969, 40E Wis. Stats. Anno. sec. 704.19. As stated in *Wagner v. Kepler* (1951), 411 Ill. 368, 104 N. E. 2d 231, at 235, 236:

"A tenancy from month to month partakes of the nature of a tenancy at will and once created exists for an indefinite period. . . . Being a tenancy of uncertain duration, it cannot be said to be a tenancy for a definite period of one month or a succession of tenancies for definite periods of one month each. Furthermore, since, in the absence of an agreement or contractual or statutory provisions to the contrary, a tenancy from month to month is only terminable by either party upon giving proper and timely notice. . . it follows that a tenancy from month to month is a single tenancy, continuous and uninterrupted until so terminated." *See also: Drum v. Pure Oil Company* (Fla. App. 1966), 184 So. 2d 196; *Janofsky v. Garland* (1941), 42 Cal. App. 2d 655, 109 Pac. 2d 750; *contra, Toms Point Apartments v. Goudzward* (1972), 72 Misc. 2d 629, 339 N. Y. Supp. 2d 281, affirmed (1973), 79 Misc. 2d 206, 360 N. Y. Supp. 2d 366; *Hour Publishing Company v. Gorez* (1968), 5 Conn. Cir. 419, 254 Atl. 2d 919.

Just as other courts found this view especially meaningful when tort liability was sought to be imposed

on the lessor for defects discovered during the landlord's "possession" at each artificial interval between the alleged "new" leases, it is submitted that the view is equally applicable here where Heiman asserts that each period was a "new" agreement and thus governed by the intervention of ch. 135, Stats. The testimony on the record rather indicates that the parties were in the process of establishing new terms, including a higher, inflexible base rent, which alterations were frustrated by national rent and price controls imposed because of economic conditions. No new agreement was in fact reached after the effective date of the dealership legislation, the parties merely abiding by the continuing periodic tenancy until notice of termination was given.

*Counterclaims.*

On this appeal, Heiman asserts that his counterclaim and request at trial was for dismissal of the eviction action and consolidation with another action pending in the county court. In fact, the "counterclaim" returned with the answer refers only to unspecified damages in the event that possession of the property be awarded to the respondent. The request for dismissal and consolidation is addressed solely to an allegation in the answer concerning the pending action. Such a joinder seems a rather unusual remedy to be sought by a "counterclaim."

A proper method of obtaining a consolidation of the actions or a consolidation for trial would normally entail a motion by Heiman to one of the judges of the branches of the same county court where his cases were pending. The appellant could also have retained a fully detailed answer and counterclaim that demonstrated on its face and thus early informed the court that permissible counterclaims beyond the jurisdiction of the small claims process were involved, such that the matter required trial

under the full procedure. A motion for consolidation could then have been made.

Instead, Heiman answered with a summary reference to another pending action. The pleadings in that action were not repeated nor otherwise incorporated as an attached exhibit. By way of counterclaim, appellant asserted undetailed damages, again without reference to whether the theory supporting such was the basis for the other pending action. On this appeal Heiman asserts some common nexus between the actions, but the appellate record is totally silent as to what was involved in the other case.

On appeal Heiman has asserted counterclaims on three general bases. Disregarding the procedural method utilized by the appellant, the propriety of the trial court's action must be judged by an analysis of the three claims.

*Damages for loss of site.*

Heiman asserts that he proposed testimony to show that he would sustain claimable losses beyond the jurisdictional limits of ch. 299, Stats., and cites error in the refusal of the court to entertain such evidence of this counterclaim. It is argued that sec. 299.40 (2), which allows a plaintiff in eviction actions to assert any other claim against the defendant arising out of the latter's possession or occupancy of the premises, extends an identical right to the defendant which was impaired here.

Counterclaims in eviction actions may include any claim "related to the rented property," as sec. 299.43, Stats., provides that they shall be considered as arising out of the "transaction or occurrence" which is the subject matter of the plaintiff's claim. In *Clark Oil, supra,* a lease as part of a dealership was the transaction underlying the eviction. This court chose to interpret the phrase "transaction or occurrence" in ch. 299 as being of limited breadth in keeping with the purposes of sum-

mary proceedings. The language in secs. 299.40 (2) and 299.43 do not broaden this base; rather, they merely allow consideration of instances involving damages arising in the use of the rented property, as was not allowed in *Kuhn v. Sol. Heavenrich Co.* (1902), 115 Wis. 447, 91 N. W. 994, cited in *Clark Oil, supra,* at p. 241. They do not refer to transactions coexistent but collateral to the lease, which may in fact have enabled the use of the rented property but do not in turn arise out of its use. *See: Malick v. Kellogg* (1903), 118 Wis. 405, 95 N. W. 372, also cited in *Clark Oil, supra.* More specifically, any claims arising out of such collateral arrangements as franchising agreements (antitrust violations, for example, in *Clark Oil*) are clearly severable and are to be treated in separate nonsummary proceedings.

Since ch. 135, Stats., was not in effect here, no substantive basis existed for a claim of damages under ch. 135 and thus a counterclaim for damages thereunder was properly ignored by the trial court. From the record on appeal, the damages claimed as arising from the eviction appear attributable only to the statute and the fiduciary theory rejected in *Clark Oil.*

*Federal regulations.*

Heiman asserts that he consistently brought certain Federal Energy Administration Rules and their application to the attention of the court. He further states that such rules were a proper matter for judicial notice.

In sec. 902.03 (2), Stats., it is provided:

"The courts of this state, including the sureme court, may take judicial notice, if requested by a party *and supplied with the necessary information,* of all rules and orders of federal agencies." (Emphasis added.)

Rossow well notes that Heiman has not seen fit to include in his appellate brief the specific rules and interpreta-

tions to which he refers. The deficiencies were also at the trial level.

The appellant's counterclaim referred to "FEA regulations" as a basis for damages. In the trial court, he introduced evidence of a failure by Rossow to provide a flow-through of a gasoline price reduction, which was reported and acted upon by the agency. In the trial and also on appeal to the circuit court, vague reference was made to the Gulf decision to withdraw from the Eau Claire area. Apparently in violation of a status quo required by federal agency regulations. The only indications that the courts at the trial and appellate levels were provided with any documentation of any federal rules is a statement by counsel for respondent in the circuit court where he mentioned such materials included with the appeal papers and further noted that these regulations provided remedies through the agency only. The circuit court apparently agreed. Heiman has not attempted to show otherwise on this appeal.

Heiman also argues that the trial court incorrectly concluded that the Federal Energy Administration Rules had no bearing, for this decision precluded him from showing that the eviction was a retaliatory action under the federal guidelines. Whether or not the federal guidelines preclude retaliatory action is an issue in itself. No claim of retaliation was presented at the trial level. The trial court was apparently no more afforded the benefit of the federal rules and their argued specific application than has been afforded this court on appeal, and it cannot be faulted for declining to assume both the role of advocate and arbiter in determining whether such an action is embraced by federal guidelines and whether retaliation is a defense in a state court action rather than by way of agency proceedings. Although retaliation is recognized as a defense to eviction in this state, the judicial adoption of the rule has been limited by policy to evictions from

residential housing solely because of complaints of housing code violations. *Dickhut v. Norton* (1970), 45 Wis. 2d 389, 173 N. W. 2d 297. Appellant cannot seriously suggest that he has asserted a claim cognizable in the summary action or requiring the entire action to be referred to nonsummary proceedings merely because he generally alleges that some unspecified rules within the Federal Energy Administration Regulations were violated. A summary review of the regulations indicates no obvious answer to the above questions on the relevancy of such rules. *See:* 15 USCA 751–756. In addition, citation to the rules apparently also was for the purpose of showing that a dealership existed which status was irrelevant, as previously shown.

*Promissory estoppel.*

Heiman also asserts a counterclaim theory which he denominates the "part performance doctrine." Reference is also made to promissory estoppel.

In *Bunbury v. Krauss* (1969), 41 Wis. 2d 522, 164 N. W. 2d 473, it was recognized that sec. 240.09, Stats. 1969, was authority for this court to disregard the ban of the statute of frauds when the contract for conveyance or holding of real property is evidenced and specifically referable by a part performance, *Wiegand v. Gissal* (1965), 28 Wis. 2d 488, 137 N. W. 2d 412, 138 N. W. 2d 740, or when other equitable considerations are applicable, *Bratt v. Peterson* (1966), 31 Wis. 2d 447, 143 N. W. 2d 538. These doctrines are now generally codified in sec. 706.04, adopted by Laws of 1969, ch. 285.

Heiman's testimony included reference to his acquisition of a service station franchise at a location owned by another major oil company upon the 1973 announcement that Gulf would be withdrawing from the area. He testified that he had gone so far as to purchase gasoline which was then delivered to that site. Apparently the ap-

pellant was then contacted by Myron Rossow, who told him that he intended to purchase the area Gulf assets and continue as an independent oil company. Testimony established that Heiman was promised a written contract and the establishment of credit card facilities for this new business if he would remain and operate the former Gulf site. He did remain, foregoing the opportunity at the other site.

Part performance, especially under the new statute, is a basis for satisfying the statute of frauds applicable to land conveyances, including rental of land for a period longer than a year. Heiman is not attempting to establish the definite terms of a contract governing use of the site and then attempting to justify statute of frauds noncompliance by showing acts specifically referable to duties under such conveyance contract; rather, he is asserting detrimental reliance on a promise to make such a contract in the future. As a contract to make a lease, it also is unenforceable under sec. 704.03, Stats., to which sec. 706.04 does not apply.

The correct nomenclature for this theory is promissory estoppel, as adopted in *Hoffman v. Red Owl Stores, Inc.* (1965), 26 Wis. 2d 683, 133 N. W. 2d 267. Elements of this affirmative remedy are:

"(1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee?

"(2) Did the promise induce such action or forbearance?

"(3) Can injustice be avoided only by enforcement of the promise?" *Forrer v. Sears, Roebuck & Co.* (1967), 36 Wis. 2d 388, 392, 153 N. W. 2d 587.

While a promise sought to be enforced need not embrace all essential details of a proposed transaction so as to be the equivalent of an offer that would result in a binding

contract if accepted, *Hoffman, supra,* at 697, 698, the discretion of the court in deciding whether injustice can be avoided by a remedy becomes more important when the promise, as of the written contract here, totally lacks detail. *Silberman v. Roethe* (1974), 64 Wis. 2d 131, 146, 218 N. W. 2d 723. It appears from the record that Rossow attempted to establish a new agreement with Heiman, but was frustrated by the rent freeze in effect at the time. The factual questions as to the first two *Hoffman* elements and the legal decision on the third element were concededly not passed upon in the trial and circuit courts.

*Hoffman* established that damages rather than estoppel may be the remedy afforded under the circumstances. In *Clark Oil,* the dealers attempted to use the theory as a defense by estoppel, which goal was not allowed because of the deficiency in their pleadings to raise the issue as against a demurrer. The pleadings here involve no indication of an intention to use promissory estoppel, although evidence relevant to the theory was adduced. It is clear, however, that the theory was being proposed solely as a counterclaim for the purpose of establishing damages upon eviction, rather than as an estoppel defense to eviction. The alleged promise of Rossow was merely to propose future tenancy agreements. No guarantee of tenancy was given and the record reveals a promise so lacking in detail as to substantially remove the option of its enforcement by estoppel. Damages as in *Hoffman* may perhaps be warranted. Consistent with the narrow interpretation of the bases permitting counterclaims, the county and circuit courts properly refused to consider the damage remedy of promissory estoppel here. It arises not from the use of the property but in response to collateral agreements enabling such use. This claim is a proper subject for exploration in forums other than the summary eviction proceeding.

We conclude that the allegations of the counterclaim and the evidence at trial were not sufficient to raise the estoppel relief of promissory estoppel. Heiman's attempt to seek damages under that theory must be litigated separately.

*By the Court.*—Judgment affirmed.