Thomas G. BUSH, Plaintiff-Respondent,

v.

## NATIONAL SCHOOL STUDIOS, INC.,
Defendant-Appellant.†

Court of Appeals

*No. 84–2056. Submitted on briefs November 18, 1985.—
Decided April 8, 1986.*

(Also reported in 389 N.W.2d 49.)

† Petition to review granted.

For the appellant there were briefs by *Phillip M. Steans* and *Solberg, Steans, Schofield & Higley* of Menomonie.

For the respondent there was a brief by *James P. Lonsdorf* and *Lonsdorf & Andraski* of Wausau.

Before Cane, P.J., Dean and Eich, JJ.

CANE, P.J. National School Studios, Inc., appeals a judgment awarding damages to Thomas Bush because it terminated his dealership agreement in vio-

lation of the Wisconsin Fair Dealership Law (WFDL).[1]
National contends that:

(1) Bush is not a "dealer" under the WFDL;

(2) Even if the WFDL applies, Bush is excluded from its protection because he is a "door-to-door" salesman;

(3) Minnesota law governs the employment contract between the parties;

(4) The trial court erred by awarding damages for both loss of income and loss of "territory rights."

Because the parties' agreements created a dealership, and because Bush is not a "door-to-door" salesman, the WFDL governs the parties' agreements. Because the verdict allows recovery for both lost future income as well as lost "territory rights," it is impermissibly duplicitous. We therefore affirm in part, reverse in part, and remand for a new trial on the issue of damages only.

The underlying facts are undisputed. Bush, a photographer for National, a Minnesota corporation, took student portraits at schools in northern Wisconsin and mailed the exposed films to National, which processed and packaged the pictures. Pursuant to an employment contract signed in 1979, he worked exclusively for National, purchased his film from National, solicited new and repeat business for the company, promoted its business by advertising, and was compensated on a commission basis. The employment contract provided that its terms were to be governed by Minnesota law and that it was subject to termination by either party upon thirty days' written notice.

---

[1] Chapter 135, Stats.

In 1979 Bush also executed a "territory succession agreement." This agreement provided that in consideration for "bookings" from schools in northern Wisconsin, Bush would pay through National $150,000 in ten equal installments to his father, a retired employee-consultant.[2] In exchange for the payments, and in addition to transferring his "bookings" to Bush, his father would provide services for National. "Bookings" represented National's good will and existing agreements with schools in a defined area. Bush paid approximately $17,000 under this agreement.

In 1982, as a result of a dispute, National terminated Bush's employment. Claiming dealership status, Bush commenced this action against National for damages based upon violations of the WFDL.[3] The jury found that National terminated Bush without cause and awarded him $50,000 for lost income and $50,000 for lost "territory rights."

To determine whether Bush is a dealer under the WFDL requires findings of fact and the application of those facts to the WFDL. The underlying facts in this case are undisputed. The application of a statute to a particular set of facts is a question of law, *Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 758, 300 N.W.2d 63, 68 (1981), to be decided without deference to the trial court's decision. *Midwest Developers v. Goma*

---

[2] George Bush was Tom Bush's father, and he started with National in the 1930's. He is credited with developing the company's "good will" in the northern one-half of Wisconsin.

[3] Specifically, sections 135.03 and 135.04, Stats., require at least 90 days' prior written notice of termination, which must be for good cause, and a 60-day period to rectify any claimed deficiency.

*Corp.,* 121 Wis. 2d 632, 651, 360 N.W.2d 554, 564 (Ct. App. 1984).

■

A dealer is a person who is a grantee of a dealership situated in this state. Section 135.02(2), Stats. A dealership is defined as:

1. [A] contract or agreement between two or more persons;

2. by which a person is granted
   a. the right to sell goods or services;
   b. the right to distribute goods or services; or
   c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; and

3. in which there is a community of interest in the business of
   a. offering goods or services;
   b. selling goods or services; or
   c. distributing goods or services at wholesale, retail by lease, agreement or otherwise.

*Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis. 2d 17, 25, 313 N.W.2d 60, 64 (1981).

In *Foerster,* the court concluded that no dealership existed because Foerster, a manufacturer's representative, did not take title to the products sold, had no involvement in the actual sale, did not conduct credit checks, nor quote or adjust prices. Foerster merely promoted the sale of products by contacting customers, and represented at least five other companies. Further, because Foerster only used calling cards and brochures of the company it was representing, the court concluded it was not authorized to identity itself with the company's trademark or logo.

439

In contrast, Bush worked exclusively for National. Pursuant to his contracts, he purchased from National the film used to develop the students' portraits. He not only solicited business but set prices and, at times, extended credit. Once the sales were made, National completed the transactions by distributing the photos to the schools. In addition, Bush used National's trademark and logo extensively on letterhead, calendars, pens, and calling cards. National required that Bush bear one-half the cost of advertising. Under these facts, we conclude that Bush was granted the right to sell National's services as well as to use its tradename and logo.

National contends that Bush was no more than a mere employee because he made no "substantial financial investment". This requirement is based upon the purposes of the WFDL. *Foerster,* 105 Wis. 2d at 24–25, 313 N.W.2d at 63-64. The law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities, or "good will" as part of their association with the grantor. *Id.* at 24, 313 N.W.2d at 63. It is "these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice." *Id.* We conclude that Bush made a substantial financial investment by his payments pursuant to the territorial succession agreement.

National argues, however, that because the payments were to be made to Bush's father, not National, out of commissions in excess of draw, they do not constitute an investment because National realized no benefit and Bush incurred no risk. We disagree. An investment is defined as an "expenditure to acquire prop-

erty or other assets in order to produce revenue." Black's Law Dictionary 741 (rev. 5th ed. 1979). The payments for "territory rights" were intended to transfer the "bookings" for the purpose of producing revenue. Whether payment was to be made from his draw or commission in excess of draw does not change the nature of the payment itself. Although the payment was intended for his father, it was no less an investment in the dealership. Transfer of "bookings" ensured National that its existing agreements and good will with schools in the area would not be lost to a competitor at the time of Bush's father's retirement. Also, in consideration of these payments, his father would continue to act as a consultant on behalf of National.

National further argues that Bush is not a dealer because the "community of interest" requirement is not met.[4] *Kania,* 99 Wis. 2d at 765, 293 N.W.2d at 71. The trial court correctly concluded, however, that a community of interest existed. Community of interest is defined as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Section 135.02(1), Stats.

The marketing of the student portraits was by common action of both National and Bush, resulting in a shared and continuing financial interest between

---

[4] This argument assumes that the substantial financial investment requirement is distinct from the community of interest requirement. Commentators suggest, however, that a substantial financial investment is one way to satisfy the community of interest requirement. *See* Dittmar, *Foerster, Inc. v. Atlas Metal Parts Co.— The Wisconsin Supreme Court Takes a Narrow View of the Dealership Law,* 1985 Wis. L. Rev. 155, 176–83.

them. Bush worked exclusively for National by obtaining customers, setting prices, purchasing film, taking photos, and collecting payment. National developed the film, did additional record keeping, and distributed the photo packages to the school while Bush maintained the customer relationship. Because the elements of a dealership were met, we conclude that Bush was granted a dealership situated in Wisconsin. Section 135.02(2), Stats.

Alternatively, National argues that if the WFDL applies, Bush is a "door-to-door" salesman and thereby excluded from its protections. Section 135.07(3), Stats. We disagree. The language of the statute shall be construed according to its common and approved usage. Section 990.01(1), Stats. The approved usage of the words "door-to-door" is house-to-house. Webster's Third New International Dictionary 674 (1976). Bush sold these services to schools, not residences. Under the plain language of WFDL, he did not market door-to-door and therefore is not excluded from its protections.[5]

---

[5] National contends that the words "door-to-door" are capable of being interpreted to mean "school-to-school." Words are ambiguous when capable of being understood by two reasonably well-informed persons to have two or more meanings. *Foerster,* 105 Wis. 2d at 22, 313 N.W.2d at 62. When statutory language is ambiguous, it is permissible to refer to its legislative intent for interpretation. *Id.* at 23, 313 N.W.2d at 63. A statute must be construed in light of its purpose. *Wisconsin Phys. Serv. Ins. Corp. v. Mitchell,* 114 Wis. 2d 338, 344, 338 N.W.2d 326, 330 (Ct. App. 1983).

Although the phrase "door-to-door" is not ambiguous, the legislative intent, however, is consistent with our determination. *See Foerster,* 105 Wis. 2d at 23, 313 N.W.2d at 63. Door-to-door salespeople are excluded from coverage because of their lack of investment in inventory, goodwill, or facilities. *See id.* at 24, 313 N.W.2d at 63.

■
National also contends that because the employment contract provided that Minnesota law governs, Bush is not a dealer under the WFDL and his damages are limited by contract. We disagree. Although parties to a contract may agree that the law of a particular jurisdiction shall govern, *see First Wisconsin National Bank v. Nicolaou,* 85 Wis. 2d 393, 396–97, 270 N.W.2d 582, 584 (Ct. App. 1978), a court is not bound by their choice. *See Cutter v. Scott & Fetzer Co.,* 510 F.Supp. 905, 909 (E.D. Wis. 1981). The general rule allowing parties to choose the law to govern their dispute must yield to the legislature's specific policy statements. *Id.* The purpose of the WFDL is to provide the dealer with remedies not otherwise available. *Id.* Its effect may not be varied by contract. Section 135.025(3), Stats. We conclude, therefore, that Minnesota law does not govern this dispute because once it is established that a dealership is created, the WFDL governs the parties' respective rights and obligations as to termination, and their contract is unenforceable to the extent that it conflicts with the provisions of this law. *Id.*

■
Lastly, National contends that the trial court erroneously permitted recovery for both lost income and lost "territory rights."[6] We agree. A dealer is entitled to damages resulting from the grantor's violation of the

---

Here, Bush made substantial financial investment by payments to transfer "bookings" and therefore his entitlement to protection is consistent with WFDL's legislative purpose.

[6] Bush contends that this argument was raised for the first time on appeal. Our review of the record satisfies us that this issue was adequately raised in the trial court.

WFDL. Section 135.06, Stats. Two measures of damages are recognized: (a) lost profits, and (b) lost business value. *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1053 (5th Cir. 1981). Lost future profits is an appropriate measure of damages when based on adequate data, *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th Cir. 1974), and proven to a reasonable probability. *Esch v. Yazoo Manufacturing Co.,* 510 F.Supp. 53, 56 (E.D. Wis. 1981). On the other hand, lost business value focuses on the reduction in value of the business. Both good will and future profits are computed into lost business value. Therefore, damages awards that include lost profits and lost business value are impermissibly duplicitous. *See C.A. May Marine,* 649 F.2d at 1053.

This issue was presented in *Albrecht v. Herald Co.,* 452 F.2d 124 (8th Cir. 1971), where a newspaper carrier sought damages against the newspaper publisher for wrongfully forcing the carrier out of business. The carrier sought reimbursement for both lost business value and lost future profits. The court held that the carrier would be made whole by reimbursement for the full value of the business, and was not entitled to additional lost future profits as well. "He is not entitled to sell the route, receive full compensation therefor, and still receive the profits the route might have made over his reasonable work-life expectancy." *Id.* at 131. The court reasoned that recovery of both was duplicitous because the value of the route depended not only on tangible assets but also on the exclusive contract for distribution of a well-regarded newspaper in a given area. Capitalizing and discounting future profits is one method of figuring present value of the business, but this does

not mean that a person is entitled to recover present value plus future profits. *Id.*

The nature of the damages awarded to Bush is similar to those in *Albrecht.* Bush lost future income from the photography dealership. He also lost "territory rights" that represented his exclusive contract to National's existing agreements and goodwill with schools in a certain area. One of Bush's expert witnesses testified that their value would be connected with the amount of income the territory could generate. Therefore, we conclude that the jury's verdict improperly gave Bush duplicitous damages by awarding both lost future income and the lost territory rights. Accordingly, we reverse the damage portion of the judgment and remand for a new trial on the damage issue only.

*By the Court.*—Judgment affirmed in part, reversed in part, and cause remanded with directions. No costs are awarded to either party.