Thomas G. BUSH, Plaintiff-Respondent,

v.

NATIONAL SCHOOL STUDIOS, INC., Defendant-
Appellant-Petitioner.

Supreme Court

*No. 84–2056. Argued April 28, 1987.—Decided June 25, 1987.*

(Also reported in 407 N.W.2d 883.)

For the defendant-appellant-petitioner there were briefs by *Leo G. Stern, Michael A. Trittipo, Fredrikson & Byron, P.A.,* Minneapolis, Minnesota, *Phillip M. Steans,* and *Solberg, Steans, Schofield & Higley,* Menomonie, and oral argument by *Mr. Stern.*

For the plaintiff-respondent there was a brief by *James P. Lonsdorf, Lonsdorf & Andraski,* Wausau, and oral argument by *James P. Lonsdorf.*

WILLIAM A. BABLITCH, J. National School Studios, Inc. (National) seeks review of a published decision of the court of appeals, *Bush v. National School Studios,* 131 Wis. 2d 435, 389 N.W.2d 49 (Ct. App. 1986), which held that Thomas G. Bush (Bush), is a "dealer" under the Wisconsin Fair Dealership Law (WFDL), and is therefore entitled to its protections, notwithstanding a clause in the agreement between the parties specifying that Minnesota law governed the contract. We conclude that because Bush was

contractually granted a right to sell National's services and shared a community of interest with National, he is a dealer as defined by the WFDL. We further conclude that because the WFDL embodies a strong state public policy, parties cannot avoid it by including a contrary choice of law provision in their contract. Accordingly, we affirm the decision of the court of appeals.

The underlying issue on review is whether Bush is a dealer as defined by the WFDL. If Bush is a dealer the court must determine whether the "door to door" sales exclusion of the WFDL denies Bush coverage. In addition, the court must resolve whether the parties' contract provision stating that Minnesota law governs the relationship, should be given effect.

In 1982, after a 21 year association, National terminated Bush's employment. Bush then commenced this action against National claiming that he was wrongfully terminated in violation of the cancellation and policy termination provisions of ch. 135, Stats., the WFDL. Bush specifically alleged he was terminated without good cause and was not given the required written notice. The trial court determined that Bush was a dealer under the WFDL and was therefore entitled to the Law's protections. The jury found that National had terminated Bush without cause and awarded damages. The court of appeals affirmed the trial court's determination that Bush was a dealer under the WFDL but reversed the damage portion of the judgment. The court held the award was duplicative and remanded for a new trial on damages. This latter ruling on damages has not been challenged by the parties.

The underlying facts in this case are undisputed. In 1961, Bush began his career as a photographer for

National, a Minnesota corporation engaged in the school photography business. Bush took student portraits at schools in northern Wisconsin. Bush was initially hired by his father, George Bush, who was manager of National's northern Wisconsin territory. In 1969, Bush became co-manager with his father and the two thereafter worked the territory together.

In 1979, after a 30 year association with National, George Bush decided to reduce his employment activity and Bush became sole manager of the northern Wisconsin territory. This transfer of territorial rights required the consent and approval of National. The terms and conditions of the transfer were set forth in a Territory Succession Agreement executed by Bush, George Bush and National on December 28, 1979. The agreement provided that Bush would pay his father $150,000 for rights to the territory. It also specified that the $150,000 was payable in 10 equal installments of $15,000 each derived only out of commissions in excess of Bush's annual draw and expenses. An addendum to the Territorial Succession Agreement provided that any failure to make payments as required under the agreement constituted a "material breach" of Bush's employment contract with National.

National was the conduit for the payments. If at the end of the year Bush's commissions exceeded his total draw of $1800 biweekly and expenses, National would automatically pay the required installment to George Bush. In exchange for the payments George Bush transferred his "bookings," which represented National's goodwill and existing agreements with schools in the territory and agreed to provide "continuing consulting services" to National or Bush. At the

time Bush was terminated, he had paid $17,000 through National to George Bush.

On December 17, 1979, just before the Territory Succession Agreement was executed Bush signed an employment contract with National. Pursuant to the contract he was to work exclusively for National as "primary or sole representative" in its ten county northern Wisconsin territory. The contract required Bush to actively solicit new and repeat business for National, purchase all film and merchandise necessary to carry on the business from National, and promote the business by assuming one-half of advertising costs. The contract provided that Bush would receive a commission equal to forty percent of National's net sales receipts in his assigned territory. The employment contract further provided that either party could terminate the agreement upon thirty days written notice to the other party. It also allowed National to terminate the agreement for cause upon 10 days written notice to Bush. The contract also contained a choice of law clause which provided as follows:

> "The provisions of this contract shall be governed by the laws of the State of Minnesota unless otherwise required by the law of conflict of laws. Any provision of this contract which may be unenforceable or invalid in the applicable jurisdiction shall be severable from the contract and shall not affect or nullify the other provisions thereof."

As territory manager, Bush traveled to schools within his territory and convinced school administrators to use National's student portrait services. In these solicitation efforts Bush prominently used and displayed the National name and logo. For example,

business cards, stationary, advertising, identification badges, and calendars and pens distributed to school administrators carried both National and Bush's name.

Once a school booked National's service through Bush he scheduled the picture taking sessions, sent notices and order forms to parents and set the price on the portrait packages. Bush had substantial latitude to set the prices on these packages. On the scheduled picture date, Bush accepted student orders, photographed the students and collected payment. Although not required to do so by National, when students were unable to make payment on the scheduled date, Bush extended them credit. After photographing the students, Bush mailed the exposed film to National which processed, packaged and distributed the finished portraits to the schools. Bush also remitted all funds collected from portrait package sales to National by depositing them in its bank account.

National did all the necessary accounting to calculate Bush's commissions. National also withheld federal and state income tax from Bush's weekly draw, and deducted amounts for health and life insurance. Bush received a W-2 form each year from National and described himself as its employee on his tax returns. In addition, each summer when schools were in recess Bush applied for and received unemployment compensation.

In November 1982, National terminated Bush's employment and Bush commenced this action claiming among other things that he was terminated without cause in violation of the WFDL. Bush stipulated that if the WFDL did not apply and the jury found National terminated him without cause, his

damages would be limited to $2500. If the jury concluded he was terminated with cause, Bush stipulated to a damage award of $1000. The jury agreed with Bush that he had been terminated without cause and awarded him $50,000 for lost income and $50,000 for lost "territory rights."

After verdict the trial court determined as a matter of law that Bush was a dealer under the WFDL and therefore the statute's good cause requirement for all dealership terminations applied. The court therefore entered judgment on the jury's verdict.

Before setting forth the analysis which leads us to conclude that Bush was operating a dealership as defined by the WFDL we will consider the preliminary issue of whether the parties' choice of law provision, selecting Minnesota law to govern the contract, should be given effect.

I. The parties choice of law clause

National contends that the clause in the employment contract specifying that Minnesota law governs the contract should be honored by this court because it does not violate fundamental Wisconsin public policy. National argues that Wisconsin ordinarily follows the same termination-at-will rule as Minnesota and that if indeed a franchise/dealership is involved, Minnesota law also protects franchises against unfair termination. Minnesota Stat. sec. 80C.14 Subd. 2(a) (1986).

In contrast, Bush argues that whether he would receive protection under Minnesota's franchise law is highly debatable. National in fact concedes that Minnesota and Wisconsin law are not co-extensive. Bush points out that the Wisconsin legislature has declared the WFDL fundamental policy and has specifically provided that its effect cannot be varied by contract. This public policy, Bush contends, renders

641

the choice of law clause in the employment contract unenforceable. We agree.

While Wisconsin courts have acknowledged that parties to a contract may expressly agree that the law of a particular jurisdiction shall control their contractual relations; *Jefferis v. Austin,* 182 Wis. 203, 205, 196 N.W. 238 (1923); *Brown v. Gates,* 120 Wis. 349, 97 N.W. 221 (1904); *First Wis. Nat. Bank of Madison v. Nicolaou,* 85 Wis. 2d 393, 397 n. 1, 270 N.W.2d 582 (Ct. App. 1978), this proposition is by no means unqualified. Though we recognize that the party autonomy principle, i.e., permitting parties to stipulate the applicable law in the contract and honoring that stipulation, promotes certainty and predictability in contractual relations, *see* Willis L. M. Reese, *Choice of Law in Torts and Contracts and Directions for the Future,* 46 Colum. J. Transnat'l L. 1, 22–24, it cannot be permitted to do so at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded.

This qualification has been recognized by commentators and frequently invoked by courts. *E.g., Barnes Group Inc. v. C & C Products, Inc.,* 716 F.2d 1023 (4th Cir. 1983) (public policy exception to party autonomy principle fully discussed and applied); Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?,* 82 Colum. L. Rev. 1659, 1669–74 (1982). (Hereinafter *Effectiveness of Choice-of-Law Clauses.)* Thus, "[w]hile contemporary doctrine recognizes a sphere of party autonomy within which contractual choice of law provisions will be given effect, it also limits the extent to which deft draftsmanship will be

allowed to bypass legislative judgments as to basic enforceability or validity." *Barnes,* 716 F.2d at 1029. (Footnotes omitted.)

A precise delineation of those policies which are sufficiently important to warrant overriding a contractual choice of law stipulation is not possible. In general, however, statutes or common law which make a particular type of contract enforceable, e.g., usury laws, or which make a particular contract provision unenforceable, e.g., laws prohibiting covenants not to compete, or that are designed to protect a weaker party against the unfair exercise of superior bargaining power by another party, are likely to embody an important state public policy.[1] Courts have recognized that fair dealership laws fall into this latter category. *E.g., Southern Intern. Sales v. Potter & Brumfield Div.,* 410 F. Supp. 1339, 1341 (S.D.N.Y. 1976) (choice of law clause specifying application of Indiana law to a contract between an Indiana manufacturer and Puerto Rican dealer not given effect in light of fundamental policy expressed in Puerto Rican Dealers' Contracts Act); *Business Incentives Co., Inc. v. Sony Corp. of Amer.,* 397 F. Supp. 63, 67 (1975) (choice of law clause in contract between New York manufacturer and New Jersey corporation specifying New York law is ineffective where New Jersey Franchise

[1]A survey of decisions indicates that courts have found the following laws embody public policies which warrant overriding the parties contractual choice of law clause: "(1) prohibitions of covenants not to compete; (2) unconscionability doctrines; (3) *fair dealership laws;* (4) boxing licensing schemes; (5) state bankruptcy laws; (6) contractor licensing schemes; (7) statutes of frauds; (8) usury statutes; and (9) insurance laws barring suicide exception clauses." *Effectiveness of Choice-of-Law Clauses, supra* at 1672–73. (Footnotes omitted.) (Emphasis added.)

Practice Act evinced a strong public state policy to protect small businesses from "more powerful commercial giants"). *cf. Cutter v. Scott & Fetzer Co.,* 510 F. Supp 905, 909 (E.D. Wis. 1981) ("the general endorsement of forum-selection clauses must yield to the legislature's specific pronouncements regarding dealerships"); *see also Effectiveness of Choice-of-Law Clauses, supra* p. 7 at 1674. For example, in *Southern Intern. Sales,* the court observed that the strong legislative policy to protect dealers manifested in the Puerto Rican Dealers' Contracts Act "could easily be circumvented were the court to announce a rule that would allow a manufacturer, by wielding its economic might against a distributor, to exact a stipulation as to governing law compelling the distributor to forsake the protection afforded him by the Puerto Rican legislature." *Southern Intern. Sales,* 410 F. Supp. at 1342.

Similarly in this case, the Wisconsin legislature intended by enactment of the WFDL "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships ...", sec. 135.025(2)(b), Stats. The statement of purpose and policy contained in the statute sec. 135.025(2), set forth in full below,[2] coupled with the explicit directive

_____

[2]"**135.025 Purposes: rules of construction; variation by contract.** (1) This chapter shall be liberally construed and applied to promote its underlying remedial purposes and policies.

"(2) The underlying purposes and policies of this chapter are:

"(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

that the effect of the WFDL "may not be varied by contract or agreement" and "[a]ny contract or agreement purporting to do so is void and unenforceable to that extent ...," amply support this court's conclusion that a strong public policy is implicated in this case. Section 135.025(3); *see also* 66 Op. Atty. Gen. 11 (1977) (explicit provision whereby parties contract that dealership agreement will be governed by the laws of a state which has no fair dealership law is invalid; provision's enforcement would defeat strong Wisconsin public policy). Therefore the court will not honor the parties' choice of law clause.

National does not argue that absent an effective choice of law provision Minnesota law would still apply. Rather, at oral argument and in its brief to this court it contends that *Bush* does not meet the Wisconsin statutory definition of dealer. We view this as an acknowledgment by National that Wisconsin law applies if the choice of law clause is disregarded. We therefore proceed to consideration of the dealership issues raised by National.

II. The dealership requirement of the WFDL

To resolve the principle issue of whether Bush is a dealer within the meaning of the WFDL, the court must apply the WFDL to the facts of this case. The

"(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

"(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

"(d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

"(3) The effect of this chapter may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only."

645

underlying facts are undisputed. Application of the WFDL to these facts involves a question of law to be decided without deference to the decisions of the trial court and court of appeals. *Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 758, 300 N.W.2d 63 (1981).

Since the enactment of the WFDL in 1974, *see* ch. 179, L. 1973, courts have wrestled with its application. The issue most frequently presented is the same one we consider here: whether a certain business relationship falls within the WFDL's definition of "dealership." Section 135.02(3), Stats., *see Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis. 2d 17, 313 N.W.2d 60 (1981) (manufacturer's representative who did not quote or adjust prices, extend credit, collect payment or expend funds on advertising was not a dealer); *Kania,* 99 Wis. 2d at 746 (plaintiff, a local cartage service, was not engaged in a dealership under WFDL but was hired as independent contractor to provide ground transportation services to air freight company); *O'Leary v. Sterling Extruder Corp.,* 533 F. Supp. 1205 (E.D. Wis. 1982) (salesman who did not prepare price quotations, invoice the defendant's products, bill customers or collect payment was an employee not a dealer under WFDL), *see also* Note, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law,* 1985 Wis. L. Rev. 155, 156 [hereinafter Note, *Foerster v. Atlas*]. The dilemma courts face in resolving this question is formulating a definition sufficiently broad to encompass non-traditional business relationships which in fact fall under the dealership rubric, yet restrictive enough to avoid "including every vendor/vendee relationship under the protective veil of ch. 135...." *Kania,* 99 Wis. 2d at 769.

In most cases, there is rarely an obvious answer to the question of whether a business is a dealership because, as one commentator has noted, most businesses operate on a continuum between the traditional franchise, e.g., the fast food restaurant, which operates under a prepackaged business format dictated by the franchisor and identified with the franchisor's trademark, which is clearly covered by the WFDL, and the multi-product independent retailer, e.g., independent hardware store selling the products of competing manufacturers. Note, *Foerster v. Atlas, supra* p. 646, at 169; *Kusel Equip. Co. v. Eclipse Packaging Equip. Ltd.*, 647 F. Supp. 80, 81 (E.D. Wis. 1986) (court recognizes the "seemingly endless variations" of dealerships between the extremes and the fact that despite the numerous cases which define dealership there is always room for argument). In this case, we must decide whether Bush falls on the dealership side of the continuum. We begin our analysis, as in all cases involving the scope and meaning of ambiguous statutory language with the statute's history, context, subject matter and object. *In Interest of P.A.K.*, 119 Wis. 2d 871, 350 N.W.2d 677 (1984).

In 1974, the Wisconsin legislature enacted the WFDL. Chapter 179, L. 1973. The legislation was hailed by Governor Patrick Lucey, who requested its introduction, as the "Magna Carta" for small-businesses.[3] A press release issued upon the WFDL's passage stated it "was drafted to strengthen the hand of small businesses that have been subject to pressures from major firms that supply the products they sell."

[3]Milwaukee Sentinel, April 4, 1974, Business Clippings File— Legislative Reference Bureau.

Press Release, Office of Governor, April 3, 1974. The Governor summarized the import of the WFDL as follows:

> "'Just about every businessman on main street holds some kind of franchise. It may be a style of clothing ... a line of hardware ... fast food service ... a brand of gasoline. In the past, many of those businessmen have been at the mercy of big corporations. And reports of improper pressure on small businessmen by those corporate giants have been frequent. The Wisconsin Fair Dealership Act, which I am signing into law today, is a move to protect our small businessmen from corporate intimidation.'" *Id.*

The description of the types of small businesses which would benefit from the WFDL reflected in this release supports the conclusion that the WFDL was intended to reach beyond the traditional franchise operation. *See* K. Axe, *Dealing With the Dealers: Scope of the Wisconsin Fair Dealership Law,* Wisconsin Bar Bulletin, August 1981, p. 7. Amendments made in the course of deliberations on the bill also support this conclusion. *See* Drafting File, ch. 179, L. 1973. The act as originally introduced, 1973 Assembly Bill 837, was entitled the "Wisconsin Fair Franchising Law." Franchise was defined by reference to the definition already provided in sec. 553.03(4)(a), Stats., the Wisconsin Franchise Investment Law:

> "'Franchise' means a contract or agreement, either express or implied, whether oral or written, between 2 or more persons by which:
> "1. A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a *marketing*

*plan or system prescribed in substantial part by a franchisor;* and

 "2. The operation of the franchisee's business pursuant to such plan or system is *substantially associated with the franchisor's business and trademark,* service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

 "3. The franchisee is required to pay, directly or indirectly, a *franchise fee."* (Emphasis added.)

In contrast, the current dealership definition of the WFDL[4] does not require a marketing plan or system prescribed by the franchisor/grantor, a business substantially associated with the grantor's business and trademark or a franchise fee.[5] These requirements, if

---

[4]"(3) "'Dealership' means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." Section 135.02(3), Stats.

[5]Assembly Substitute Amendment 1 to 1973 Assembly Bill 837 introduced by Representative Earl, effected the change in language from "franchise" to "dealership" and substituted the current definition. Representative Earl subsequently offered an amendment which would have changed the "dealership" definition to cover dealers who "establish or maintain in this state a fixed geographic location, other than an office, warehouse, place of storage, residence or vehicle, at which the dealer displays for sale and sells the grantor's goods or offers for sale and sells the grantor's services." Assembly Amendment 1 to Assembly Substitute Amendment 1 to 1973 Assembly Bill 837. This definition which would have required a capital investment in a sales facility and possibly inventory was rejected by the Assembly. *See* 3 Wis. Assembly J. 3469 (1973).

enacted, would have effectively limited the application of the WFDL to traditional franchises, e.g., the fast food restaurant, where the franchisor virtually dictates every aspect of the franchisee's business operations. Efforts to restrict application of the WFDL to specific industries were also unsuccessful. *See, e.g.,* Senate Substitute Amendment to 1973 Assembly Bill 837 (attempt to restrict WFDL's application to sellers of petroleum products only).[6]

In 1977, the legislature created a new section of the WFDL which adopted a broad policy statement, quoted in full *supra* p. 644 n. 2, setting forth the purpose and scope of the law. Chapter 171, L. 1977. The statement, sec. 135.025, Stats., in no way indicates that the statute is to apply only to very limited types of dealership arrangements. Rather it evinces the legislature's intent to enhance the bargaining position of business persons who are economically dependent upon commercial relationships with grantors. The legislature sought to remedy the unfair treatment of these business persons engendered by this unequal bargaining relationship. *See Kusel,* 647 F. Supp. at 81 (purpose of the WFDL "is to protect dealers from the ordinarily vastly superior economic power of grantors of dealerships"); *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.,* 539 F. Supp. 1357, 1365 (W.D. Wis. 1982) (recognizing "the legislature's expressed concern with the imbalance of power between dealers and grantors ... ") *aff'd,* 761 F.2d 345 (1985).

The legislative intent reflected in the statute's statement of purposes, sec. 135.025, Stats., coupled

---

[6]In 1977, the insurance industry was successful in securing an amendment providing that the WFDL does not apply to the insurance business. Chapter 371, L. 1975.

with the legislature's refusal to accept a narrow definition of dealership convinces us that in determining whether a dealership exists, courts should not focus solely on identifying the telltale trappings of the traditional franchise. Rather courts should consider the overriding principle of whether the business' status is dependent upon the relationship with the grantor for its economic livelihood. If such dependency does exist, the business would be extremely vulnerable if terminated without good cause and adequate notice. This court stated in *Rossow Oil Co. v. Heiman,* 72 Wis. 2d 696, 702, 242 N.W.2d 176 (1976), "[i]t is clear that these statutory provisions were enacted for the protection of the interests of the dealer, whose economic livelihood may be imperiled by the dealership grantor, whatever its size." With this overriding principle in mind, we turn to the issue of whether Bush qualifies for protection as a dealer under the WFDL.

This court has recognized that in order for a business relationship to constitute a protected dealership under the WFDL the following criteria must be met:

"1. a contract or agreement between two or more persons;

"2. by which a person is granted
 "a. the right to sell goods or services;
 "b. the right to distribute goods or services; *or*
 "c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; *and*

"3. in which there is a community of interest in the business of
 "a. offering goods or services;

"b. selling goods or services; or

"c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise." *Kania,* 99 Wis. 2d at 763.

In addition, to enjoy the WFDL's protections, a business must not be specifically excluded by its "nonapplicability" section, sec. 135.07, Stats.[7] We turn now to the facts of this case to determine whether Bush meets these statutory requirements and is therefore a dealer entitled to the protections of the WFDL.

National does not dispute the existence of a contract with Bush; therefore, the first definitional requirement is met. However, National contends that Bush was a conventional employee and therefore did not have an independent right to sell or distribute National's goods or services. Thus, National argues the second criterion of the "dealership" definition is not met.

This court agrees that the WFDL's protections do not reach conventional employer-employee relationships. *E.g., Moore v. Tandy Corp., Radio Shack Div.,* 631 F. Supp. 1037, 1045 (W.D. Wis. 1986) ("It is clear that the definition of dealership does not extend to a conventional employer-employee relationship"), *aff'd,* No. 86–2313, Slip op. (7th Cir. May 18, 1987). But the

---

[7]"135.07 **Nonapplicability.** This chapter does not apply:

"(1) To a dealership to which a motor vehicle dealer or motor vehicle distributor or wholesaler as defined in s. 218.01 (1) is a party in such capacity.

"(2) To the insurance business.

"(3) Where goods or services are marketed by a dealership on a door to door basis."

test to determine dealer versus employee status is not, as National suggests, whether Bush is "identifiably separate" from National to be considered an "independent businessman." In fact interdependence is the essence of a dealership arrangement, as the "community of interest"[8] requirement confirms. If Bush by contract or agreement has been granted the right to sell National's services and shares a "community of interest" with National he is a dealer and not merely an employee. We are convinced by the facts that Bush is far from a conventional employee.

We acknowledge that one of the agreements between the parties is designated as an employment contract and that Bush was treated as an employee for tax and unemployment compensation purposes. But this is not dispositive of Bush's status. *See Moore,* 631 F. Supp. at 1050 (labels of "employer" and "employee" contained in a cleverly drafted manager incentive agreement are insufficient to insulate company from liability under WFDL). We must consider the actual duties and responsibilities of each party in this business relationship to determine whether Bush was granted the right to sell National's portrait services and whether they shared a community of interest in the offering of those services.

Bush by contract was the sole representative of National in northern Wisconsin. Pursuant to his contract Bush solicited business, set prices, collected payment, and at times extended credit. Moreover, he provided a substantial and integral part of the por-

---

[8]"Community of interest" is defined as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Section 135.02(1), Stats.

653

trait service—photographing the students. As required by contract he purchased the film from National and bore fifty percent of the cost of advertising in the territory. In addition, Bush extensively used National's trademark and logo on a variety of solicitation materials as well as his letterhead and calling cards. *See Foerster,* 105 Wis. 2d at 26. As the court in *Foerster* recognized, the right to sell "generally includes authority to commit the grantor to a sale...." *Id.* In this case the record amply demonstrates that Bush had such authority. Based on these facts we conclude that Bush was granted the right to sell National's services and to use its tradename and logo. Thus, the second criterion of the statutory definition is met.

The cases relied on by National, *Wilburn v. Jack Cartwright, Inc.,* 719 F.2d 262 (7th Cir. 1983), *O'Leary v. Sterling Extruder Corp.,* 533 F. Supp. 1205 (E.D. Wis. 1982), *Quirk v. Atlanta Stove Works, Inc.,* 537 F. Supp. 907 (E.D. Wis. 1982), do not compel a different conclusion. While it is true that the business relationships which sought dealership status in these cases share some of the same characteristics as Bush's relationship with National, none of the would-be dealers had the same substantial obligations, quantitative and qualitative, that the business agreement with National imposed on Bush. For example, unlike Bush, none of the businesses in the cases relied on by National were required to do *all* of the following: assume the costs of advertising, set prices, or collect payment.

We now turn to the "community of interest" requirement of the statutory definition. National contends that no "community of interest" exists between itself and Bush. This requirement contemp-

lates a shared financial interest in the operation of the dealership or the marketing of a good or service. *Kania,* 99 Wis. 2d at 767. We agree with the court of appeals that the marketing of student portraits was a joint undertaking of Bush and National. Bush and National shared in the profitability of the undertaking. Forty percent of net sales receipts were returned to Bush as commission; National retained the remaining sixty percent.

National's continuing financial interest in the marketing of its portrait services is also evidenced by its concern over the quality of its product. This concern prompted National's requirement that Bush buy his film directly from National. Courts have recognized that while performance standards and requirements do not directly bring in sales profits, they are directly related to a grantor's goodwill, which is a financial asset on its balance sheet.

The "community of interest" criterion is also met because Bush made a substantial financial investment in the portrait service business.[9] We conclude Bush's payments to his father for "territory rights" pursuant to the territorial succession agreement constitute a substantial financial investment. National argues that the payments were not for territory rights, because neither Bush nor George Bush owned the territory, but were made in order to "transfer bookings." This is an empty distinction which does not

[9]We note that this court has required businesses to demonstrate a substantial financial investment in inventory, physical facilities or "good will" to qualify for the act's protection. *Foerster,* 105 Wis. 2d at 24. We do not consider this requirement analytically distinct from the "community of interest" requirement. A substantial financial investment is one way to satisfy the "community of interest" requirement.

affect the fact that Bush contractually agreed to pay $150,000 for the right to take school photographs using National's name and services in northern Wisconsin. However designated, this constitutes a substantial financial investment.

National also contends the payment was not the type of investment required by the WFDL because 1) National as grantor received no benefit because the payments were made to George Bush; 2) Bush incurred no risk inasmuch as payments were to be made from his draw in excess of commission; and 3) payments were not made in advance of the transfer of the bookings.

Though payment of the $150,000 was to be made to George Bush, the arrangement ensured that National's existing agreements and goodwill with the schools in northern Wisconsin would not be jeopardized upon George Bush's retirement. In addition, National received the consulting services of George Bush in consideration of the payments promised by Bush to his father. In light of these facts, we cannot accept National's contention that it received no benefits from Bush's payments.

While it is true that the Territory Succession Agreement did establish an installment payment plan which provided for payment only from Bush's draw in excess of commission, it does not follow that Bush incurred no risk of loss. Bush paid $17,000 for territory rights. The money was not returned to him when those rights were terminated by National. It would be absurd to conclude, particularly in light of the WFDL's legislative history, that a dealership exists only where the entire investment is paid up front. No such requirement exists in the statute and we will not engraft one.

National relies on *Moore,* 631 F. Supp. 1037 to support its contention that Bush incurred no risk of loss. In *Moore,* the would be dealer, Moore paid a fully refundable security deposit to the Tandy Corporation. *Id.* at 1050. In fact upon his termination, the $70,000 deposit was returned. *Id.* at 1044. Bush on the other hand, promised to pay a nonrefundable $150,000 for rights to a territory. He had paid $17,000 at the time of his termination which he completely lost. This fact is sufficient to distinguish the present case from *Moore.* Based on these factors we conclude Bush and National have sufficient mutual interest in the promotion and provision of portrait services to satisfy the community of interest requirement of the WFDL. In summary, Bush meets the statutory dealership definition of the WFDL because he was contractually granted the right to sell National's services and to use its tradename and logotype and shared a community of interest with National in the offering of those services.

Nevertheless, National argues that even if Bush is deemed a dealer under the WFDL he should be denied coverage by virtue of the door to door sales exclusion of sec. 135.07, Stats. That section states that the WFDL does not apply: "(3) Where goods or services are marketed by a dealership on a door to door basis." National urges this court to equate "door to door" with sales made "other than in a fixed business place." National also contends that the term "door to door" should not be limited to residential doors. "Door to door" National argues, should be interpreted as encompassing sales people who go to the customer rather than having the customer come to a fixed place of business.

Section 990.01(1), Stats., directs that statutory words and phrases "shall be construed according to common and approved usage." The common meaning of the term "door to door" is "house to house." Webster's Third New International Dictionary, p. 674 (1976). Bush sold portraits to students at the schools, not at their homes. Even if we were to concede that the term "door to door" is ambiguous, which would therefore permit reference to legislative intent, we could not interpret it to require a fixed place of business as National urges. Such a requirement would ignore the WFDL's legislative history which manifests the legislature's intent not to require businesses to maintain a fixed place of business to receive protection under this act. *See* discussion *supra* p. 649. In any event, under the plain language of the WFDL, Bush is not a "door to door" salesperson and is therefore not excluded from its protections.

*By the Court.*—The decision of the court of appeals is affirmed.

STEINMETZ, J. (*dissenting*). As we held in *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 23, 313 N.W.2d 60 (1981), sec. 135.02, Stats., the Wisconsin Fair Dealership Law is ambiguous. The definition of dealership at "Definitions," subsec. (2) is vague and ambiguous. Whether there is a dealership by that section depends principally on whether "there is a community of interest in the business. . . ." Nothing could be more uncertain than whether a community of interest exists.

I do not believe the decision by the majority assists in clearing up the ambiguity of the statute and may even add to the confusion and uncertainty in the law.

Whether Bush made a substantial financial investment in the relationship with National is uncertain. He did agree to pay his father $150,000 for rights to the territory, but this was not a substantial investment going to the benefit of National, but rather to the son's benefit directly for his father's goodwill and assistance. Bush's father had some duties to National or his son as a consultant. While National arranged how both Bush and his father would be paid, the company did not directly benefit from Bush's payments to his father. Since Bush was on commission, his father's expertise would help to increase his sales and thereby his commissions. While this inferentially helped National, it was not the same type of "investment" as an investment in buildings, advertising, inventory and the like.

Also, the money was to be paid "in 10 equal installments of $15,000 each derived only out of commissions in excess of Bush's annual draw and expenses." Majority opinion at 638. Therefore, the money was not a substantial investment flowing to National's benefit, but rather was the payout through National to Bush's father for the territory rights. Any failure to make the payments as required under the agreement constituted a "material breach" of Bush's employment contract with National. The agreement was required to have Bush's father continue to transfer his "bookings" which represented National's goodwill and existing agreements with schools in the territory and to provide "continuing consulting services" by him. It is not explained in the record why those bookings did not belong to National instead of Bush's father unless he had been working as an independent contractor with National. This is not a situation where Bush took a risk of losing everything.

His agreement left him risk free; if he did not make more than the required percentage of profits, National and his father would not make or get payments.

The most important issue in the case, however, is whether Bush was actually an employee under an employment contract and not a dealer. Under the employment contract, he was to work exclusively for National as "primary or sole representative" in its ten county northern Wisconsin territory. The contract required Bush to actively solicit new and repeat business for National, purchase all film and merchandise necessary to carry on the business from National, and promote the business by assuming one-half of advertising costs. The contract provided that Bush would receive a commission equal to 40 percent of National's net sales receipts in his assigned territory. The employment contract further provided that either party could terminate the agreement upon 30 days written notice to the other party. It also allowed National to terminate the agreement for cause upon ten days written notice to Bush.

Consistent with it being an employment relationship and not a dealership, National withheld federal and state income taxes from Bush's weekly draw and deducted amounts for health and life insurance. Bush received a W-2 form each year from National and described himself as its employee on his tax returns. In addition, each summer when schools were in recess, Bush applied for and received unemployment compensation. With all of these indicia of being an employee, the majority confuses the law by labeling his relationship with National as a dealership.

The majority relies on *Moore v. Tandy Corp., Radio Shack Div.*, 631 F. Supp. 1037, 1045 (W.D. Wis. 1986) for the proposition that these indicia do not

control the relationship. However, *Moore* only dealt with the terms "employer" and "employee" included within the contract. Actions consistent with an employer-employee relationship are certainly a different matter. If Bush had a dealership for the company, he would not be entitled to apply for unemployment benefits. If the sole product of a dealer is seasonal, so is his income. But if an employee cannot sell the product his company offers, he may be eligible for unemployment. Since Bush took the benefits of being an employee, he should not be considered a dealer.

Certainly Bush's livelihood was vulnerable as an employee who could be terminated so that such vulnerability does make him a dealer. His livelihood was dependent on National whether he was a dealer or employee. He had no substantial economic investment that would be in jeopardy or lost once his relationship with National was terminated. His commitment with his father was contingent upon continuing his relationship with National, for without that he would not be receiving commission out of which his father could be paid.

The majority at page 653 of the opinion states: "We are convinced by the facts that Bush is far from a conventional employee." That language evidences doubt and confusion since he is found to be an employee even though not a "conventional" one. This is not a "cleverly drafted" manager incentive agreement entered into as an attempt to insulate National from liability under the Wisconsin Fair Dealership Law. Only an appellate court not subject to further review can label a zebra with all of its stripes a camel; nor should we label an employment contract a dealership.

Other than the alleged substantial interest of Bush found by the majority, there are no additional indicia of the community interest requirement, and, therefore, footnote 9 at page 655 of the opinion is a gratuitous statement in this case.

I dissent and would reverse the court of appeals.